IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 1, 2023

## IN RE JAXSON F., ET AL.[1]

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-06604      Mark Strange, Judge**

_____

## No. E2023-00326-COA-R3-PT

_____

The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the mother's parental rights to her two children. Following a trial, the juvenile court found that six grounds for termination had been proven and that termination of the mother's parental rights was in the children's best interests. Based on these findings, the mother's parental rights were terminated. The mother appeals. Of the six grounds the juvenile court found had been proven, we affirm four of them but reverse two. We also affirm the determination that termination of the mother's parental rights is in the best interests of the children. Accordingly, we affirm the termination of her parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in part; Reversed in part, and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN and KRISTI M. DAVIS, JJ., joined.

Lyndon King, Kodak, Tennessee, for the appellant, Chelcee S.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services

## OPINION

### FACTS AND PROCEDURAL HISTORY

---

[1] This court has a policy of protecting the identity of children by initializing the last names of the children, parents, close relatives, and pre-adoptive parents.

Chelcee R. S. ("Mother") is the sole surviving parent of Jaxson E. F. and Emma J. F., ("the Children"), born in November of 2015 and February of 2018, respectively. The father of the Children, Jordan E. F., was not a party to the trial court proceedings because he died prior to the filing of the petition to terminate.

The Children went into DCS custody on June 25, 2021, following a request from the police for immediate assistance to care for two minor children when Mother was arrested at a restaurant in Cocke County for intoxication, child abuse, and child neglect.[2] Soon thereafter, DCS visited Mother at the Cocke County Jail to ascertain whether the Children could be placed with any relatives, but Mother did not have any family in Tennessee. While in jail, Mother admitted that she used "H&M"[3] the previous Friday and that the "track marks" on her arm were from intravenous drug use; however, Mother refused to take a urine drug screen, admitting that she would not be clean. Mother later pleaded guilty to child neglect.

On June 27, 2021, DCS filed a petition in the Juvenile Court for Cocke County, Tennessee, to adjudicate the Children dependent and neglected. On the same day, the juvenile court entered a protective custody order finding probable cause to believe that the Children were dependent and neglected. The juvenile court also awarded temporary legal custody to DCS *nunc pro tunc* as of June 25, 2021, and ordered that Mother would have supervised visitation.

On August 31, 2021, Mother waived the adjudicatory hearing and stipulated that there was clear and convincing evidence to find the Children dependent and neglected based on the reasons set out in DCS's petition. The juvenile court held that it was reasonable to make no effort to maintain the Children in the home and that Mother would have supervised visitation. The court also allowed Mother's aunt, Dawn A. ("Aunt"), who lived in California, to intervene and ordered that an Interstate Compact on the Placement of Children ("ICPC") evaluation be conducted on Aunt's home to determine whether it was safe for the Children. On February 9, 2022, the Children were placed with Aunt via the ICPC in California, where they remained until December 16, 2022.

The Children were removed from the family placement because one of the Children ingested a Tetrahydrocannabinol (THC) "gummy" that was left on a nightstand of Aunt's home. Thereafter, the Children were returned to DCS custody in Tennessee where they continue to reside with a foster family.

In the interim, three permanency plans were created and ratified before the termination petition was filed. The first permanency plan was created on July 15, 2021, and required Mother to complete the following responsibilities:

---

[2] Mother's companion, David J., was arrested for public intoxication.

[3] This is an apparent reference to heroin and methamphetamines.

1. Follow and abide by the rules of her probation;
2. Avoid incurring any new charges;
3. Complete an alcohol and drug assessment and follow all recommendations;
4. Submit to random drug screens and test negative for all illegal substances for which she does not have a valid prescription;
5. Complete a mental health assessment and follow all recommendations;
6. Confirm visits a minimum of 24 hours in advance;
7. Attend visitation and provide items the Children will need during visits;
8. Allow DCS to conduct home visits;
9. Obtain and maintain a legal source of employment and provide proof;
10. Provide proof of safe and stable housing;
11. Provide the name of any adult living in the home so DCS can complete a background check;
12. Pay child support as deemed appropriate through the court; and
13. Provide a transportation plan.[4]

On January 20, 2022, DCS amended the permanency plan. Although most of Mother's responsibilities remained the same, her responsibility regarding her visitation was changed to accommodate the Children's anticipated placement in California. Once the Children were placed in California, Mother was to coordinate with Aunt to schedule and conduct weekly video visitations with the Children.

Three months later, on April 13, 2022, the permanency plan was again amended, although most of Mother's responsibilities remained the same. The third permanency plan added the responsibility that if Mother were to become involved in a relationship, she would inform DCS so that DCS could determine whether Mother's new paramour was appropriate to be around the Children.

The juvenile court ratified both the second and third permanency plans on May 24, 2022. The dual goals of the plans were to "return to parent and adoption." Significantly, however, the court found Mother to be in substantial noncompliance with the plans, as she incurred additional criminal charges and lacked housing because she had been "kicked out" of a halfway house after testing positive for fentanyl.

Mother failed to follow through with her responsibilities under the permanency plans, many of which involved overcoming her substance abuse issues. She also failed to follow the rules of probation by incurring new criminal charges. Specifically, Mother was arrested three additional times after the Children came into DCS custody. On July 19, 2021, Mother was incarcerated for possession of schedule II drugs and public intoxication.

---

[4] On August 31, 2021, the juvenile court ratified the first permanency plan with the goal to return the Children to Mother.

Mother violated probation in September 2021 while she was at the halfway house. Mother was arrested in November 2021 but later was released. Further, she was arrested on September 7, 2022, for failing to report to probation after she was discharged from her halfway house. Mother remained incarcerated at the time of trial.

In the interim, on June 15, 2022, DCS commenced this action by filing a Petition to Terminate the Parental Rights of Mother in the Juvenile Court for Cocke County, Tennessee. After Mother was served with process and appeared in the trial court, she requested the appointment of counsel, which the trial court granted.

The trial on the petition for termination was held on January 5, 2023, during which the court heard testimony from Mother, DCS case worker Robert Rouleau, and former DCS case worker Jessica Eslinger.

In its final order, entered on February 23, 2023, the trial court found that the following grounds for termination had been proven: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plans; (5) persistent conditions; and (6) failure to manifest an ability and willingness to assume custody. The court also found that termination of Mother's parental rights was in the best interests of the Children. Thus, the court terminated Mother's parental rights.

This appeal followed.

## ISSUES

The sole issue presented by Mother is whether the trial court erred in finding it in the best interests of the Children to terminate her parental rights. Although Mother only raises this one issue, this court has an affirmative duty to additionally review the trial court's findings as to each ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016). Thus, we shall also determine whether the trial court erred in finding that DCS had proven any grounds for termination.

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citation omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522.

In an appeal, "this [c]ourt is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must "determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record with a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Questions of law, however, are reviewed de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524.

**ANALYSIS**

I.      GROUNDS FOR TERMINATION

The juvenile court found that DCS had proven six grounds for termination of Mother's parental rights: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; (3) persistent conditions; (4) failure to manifest an ability and willingness to assume custody; (5) abandonment by failure to visit; and (6) abandonment by failure to support. However, DCS does not defend two of the grounds on appeal, that of abandonment by failure to visit and abandonment by failure to support due to the application of an incorrect four-month period. Having reviewed the record, we agree that the juvenile court erred in making its determination that these two grounds had been proven. Accordingly, we reverse the juvenile court's finding that the grounds of abandonment by failure to visit and abandonment by failure to support had been proven.

We now turn our attention to the four grounds DCS insists should be affirmed.

## A. Failure to Provide a Suitable Home

To establish the ground of abandonment for failing to provide a suitable home, *see* Tenn. Code Ann. § 36-1-102(1)(A)(ii), the petitioner must demonstrate that:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department. . . ;
>
> (b) The juvenile court found . . . that the department . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department . . . made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department . . . to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

A suitable home must be more than adequate "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). It requires that the child receive appropriate care and attention. *Id*. A suitable home should be free from drugs and domestic violence. *Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007), ("[T]hese parents have not provided a suitable home for these children due to the drug and domestic violence issues that have plagued them for years, and continue to do so. . . ."). Moreover, matters related to counseling and assessments are "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009).

This ground requires DCS to make reasonable efforts to assist the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Kaliyah S.*, 455 S.W.3d 533, 553 n.29, 554 n.31,

555 n.32 (Tenn. 2015). DCS's efforts to assist a parent "shall be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). "[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from custody." *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. 2014) (*quoting In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)) (no perm. app. filed).

Following the trial on DCS's petition for termination of Mother's parental rights, the juvenile court made the following findings regarding this ground:

> The Cocke County Juvenile Court adjudicated the children dependent and neglected on August 31, 2021, after issuing an emergency protective custody order placing the children in temporary DCS custody on June 25, 2021.
>
> At that time, the Court found that there were no reasonable efforts required due to the circumstance of the children. In the sixteen months since removal, DCS provided [Mother] with every opportunity to resolve the issues that necessitated Jaxson and Emma coming into the custody of DCS. However, [Mother] made choices which have only prolonged Mother's lack of stability. DCS has provided [Mother] with visitation, offering to pay for assessments, and would have provided other relevant services as necessary to reunify the family. Despite the efforts of DCS, [Mother] has been unable to provide suitable housing for the children.
>
> [Mother] testified that prior to the Department becoming involved she had been able to provide for Jaxson and Emma. The Court finds that is no longer the case. This case has been open for quite some time and [Mother] never took affirmative steps to do the things she needed to do to find a suitable home. [Mother]'s attorney's argument that she "simply did not have a home" does not hold water. As discussed above, [Mother] did not have a home because of her own choices. [Mother] chose illicit narcotics over providing a safe and suitable home for Jaxson and Emma.

Based on these findings the juvenile court concluded, "By clear and convincing evidence, the Court finds that the requirements of Tennessee Code Annotated §36-1-113(g)(1) and 36-1-102(1)(A)(ii) have been met."

As the juvenile court found, the record fully supports the findings that the Children were removed from Mother's custody on June 25, 2021, and that DCS made reasonable efforts to prevent the Children's removal.

The evidence in the record before us also reveals that DCS made reasonable efforts to assist Mother during the relevant four-month period following removal, that being from June 26, 2021, to October 26, 2021, as well as the entire custodial period. The record also shows that DCS created permanency plans and scheduled alcohol and drug assessments, mental assessments, and parenting classes for Mother. It also proves that DCS assisted Mother by providing transport to visitation with the Children, in-person, as well as by providing video visitations when necessary. However, Mother failed to make reciprocal efforts.

Most significantly, Mother tested positive on multiple occasions for illicit substances, such as amphetamines, methamphetamines, and fentanyl. She did not complete her assessments. Further, as a result of her fentanyl use, Mother was removed from the halfway home, after which she became homeless. In fact, Mother was homeless both at the time the Children came into DCS custody and at the time of trial. Further, Mother remained homeless, traveling from place to place, until her incarceration in September 2022, where she remained at the time of trial.

For the foregoing reasons, including, without limitation, Mother's inability to overcome her substance abuse problems and lack of housing, we have determined that the record clearly and convincingly supports the trial court's determination that DCS proved the ground of abandonment based on Mother's failure to provide a suitable home.

### B. Substantial Noncompliance with the Permanency Plans

A parent's rights may be terminated for substantial noncompliance with the responsibilities contained in a permanency plan, Tenn. Code Ann. § 36–1–113(g)(2), so long as the plan requirements are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine,* 79 S.W.3d 539, 547 (Tenn. 2002). Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed, and "going through the motions" does not constitute substantial compliance. *Id.* The court must also determine that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). "Trivial, minor, or technical deviations" do not arise to substantial noncompliance. *Id*.

DCS developed three permanency plans for Mother, the first entered on July 15, 2021, the second on January 20, 2022, and the third on April 13, 2022. The goals of each plan were related to the conditions that caused the Children to come into DCS custody: Mother's substance abuse, her arrests, and her homelessness. The more significant goals set forth in the plans required Mother to:

1. Abide by the rules of her probation;
2. Not incur any new charges and resolve existing charges;
3. Complete an honest and open Alcohol and Drug Assessment and follow all recommendations of the assessment;
4. Submit to random drug screens via nail bed, saliva, hair follicle, and urine and test negative for all illegal substances and substances for which she does not have a valid prescription. If she has a valid prescription, she will allow for random pill counts;
5. Complete an open and honest mental health assessment and complete all recommendations of the assessment;

*    *    *

7. Enjoy visitation with the children according to DCS policy and procedures;

*    *    *

9. Allow DCS to do announced and unannounced visits to assess the safety of the home;
10. Maintain a legal source of employment;
11. Provide proof of safe and stable housing through rental receipts or a lease agreement;

*    *    *

13. Pay child support as deemed appropriate through the Court.

The juvenile court found that Mother's responsibilities under the three plans were reasonable and related to remedying the circumstances that brought the Children into DCS custody. Having reviewed the plans and the record before us, we affirm this finding.

At the conclusion of the trial, the juvenile court found that Mother had not substantially complied and, in some cases, had not attempted to comply with the permanency plans. As the trial court stated, her shortcomings included not:

1. Completing an Alcohol and Drug Assessment and complying with the recommendations of the alcohol and drug assessment
2. Completing a mental health assessment and complying with the recommendations of the mental health assessment
3. Completing a parenting assessment and complying with the recommendations of the mental health assessment
4. Attend[ing] Parenting Classes, not to include classes for divorcing parents
5. Obtaining a legal source of employment sufficient to support the needs of [Mother] and the Children
6. Obtaining a legal source of transportation, which may include proof of sufficient access to public transportation, obtaining a drivers license, obtaining an automobile and automobile insurance, and providing proof of such to DCS . . .

7. Try[ing] to visit the children and to work with DCS to setup an appropriate visitation schedule

The court also found that "[Mother] was not following the rules of her probation, as evidenced by her subsequent arrest and current incarceration status." The court further found that "[Mother] has been given opportunity after opportunity. In the two years that this case has been open, [Mother] has not taken advantage of the opportunities provided to her, many of which would have been paid for by the Department."

Based on these and other findings, which we have determined are supported by the record, the juvenile court concluded that the requirements of Tennessee Code Annotated §§ 36-1-113(g)(2) and 37-2-403(a)(2) had been met and the ground proven. Further, we hold that DCS proved by clear and convincing evidence that Mother failed to substantially comply with the permanency plans. Thus, we affirm the trial court's finding on this ground.

### C. Persistence of Conditions

Parental rights may be terminated for persistence of conditions when:

(g)(3) [t]he child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36–1–113(g)(3). It is undisputed that the Children had been removed from Mother's custody by court order for more than six months at the time of the termination hearing.

In its final order, the juvenile court ruled:

The Court finds that Jaxson and Emma were removed from [Mother]'s home because of illicit drug use, a choice that [Mother] made. In an emergency

protective custody order, the Court found probable cause to bring the children into the Department's custody after [Mother] was arrested. At the dependency and neglect hearing, [Mother] waived her rights to a hearing and stipulated to the facts as they were alleged in the petition. [Mother] made her choice, and these are choices that she will forever have to live with. By [Mother]'s own admission, she has had multiple relapses during the pendency of this case from the genesis of the case until today. [Mother]'s attorney mentioned that [Mother] is addressing her legal issues. The Court finds that [Mother] is only addressing her legal issues today because she was forced to do so by the State of Tennessee. Probation is a privilege. Probation is a great alternative to jail. [Mother] was given the opportunity and chose not to address the problems she had with the legal system until she was forced to do so by the State of Tennessee. [Mother] has been incarcerated since September and testified that she was ordered to go to rehab. However, [Mother] is still in jail and not in rehab, likely because she is getting two for ones, and that is a quicker way to get out than going to a long-term rehab.

For these reasons the court concluded that DCS had proven the ground of persistent conditions, *see* Tennessee Code Annotated §36-1-113(g)(3), by clear and convincing evidence. Based upon the findings stated above, which we have determined are supported by the record, we affirm the trial court's determination that this ground was proven.

D. Failure to Manifest an Ability and Willingness to Assume Custody

This ground requires that the petitioner, DCS, prove two elements by clear and convincing evidence. First, the petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Both elements must be satisfied for this ground to be established. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

As for the first element, our Supreme Court has explained that the petitioner must prove by clear and convincing evidence that the parent has failed to manifest *either* ability or willingness. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis added). If either is proven, then the first element is satisfied. *Id.*

With regard to the second element, the court has not identified a set list of circumstances that would constitute substantial harm because of the varied forms of conduct in which substantial harm can arise. However, this court has stated that "substantial harm" would indicate two things. "First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a

- 11 -

theoretical possibility." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *11 (Tenn. Ct. App. June 20, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found that in the time since Jaxson and Emma came into DCS custody, "[Mother] manifested no ability to parent Jaxson and Emma. During the almost two years that Jaxson and Emma have been in custody, [Mother] has been given every opportunity to show an ability to parent these children, yet she has been unable to do so." The court went on to find:

> [Mother]'s attorney made a strong argument that these failures are related to [Mother]'s addiction, and the Court does not dispute those facts. However, the Court believes that [Mother] has made choices of who she had around Jaxson and Emma. [Mother] has made the choices of the things that she has done on her own volition while Jaxson and Emma were in her custody, and since they were removed from her custody. In the almost two years that Jaxson and Emma have been in the Department's custody, [Mother] has been provided every opportunity by the State of Tennessee to manifest the ability to parent and has clearly chosen not to do so.
>
> The Court does not discount the fact that those choices were affected by [Mother]'s drug use and addiction. Nevertheless, the Court acknowledges the fact that the choices that [Mother] made were her choices, and at the end of the day, was the one who needed to make the determination on what she wanted. [Mother] ultimately chose a life of illicit narcotic use over that of her children, Jaxson and Emma.

Based on these findings the juvenile court concluded that DCS had proven this ground, codified at Tennessee Code Annotated §36-1-113(g)(3), by clear and convincing evidence. For the reasons stated by the trial court above, the findings of which are supported by the record, and based on facts we have recited in our discussion of other grounds above, we affirm the trial court's determination that this ground was proven.

## II. BEST INTEREST FACTORS

Because we have determined that at least one ground has been established upon which to terminate Mother's parental rights, our focus shifts to whether it is in the Children's best interests that Mother's rights be terminated. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005).

"When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest." *In re Jude M.*, 619 S.W.3d 224,

244 (Tenn. Ct. App. 2020). As such, the courts must review each factor "from the child's, rather than the parent's perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).

Tennessee Code Annotated section 36-1-113(i) provides a non-exhaustive list of factors for courts to consider in determining whether termination is in the children's best interests. As the juvenile court noted in its final order, these statutory factors are illustrative, not exclusive, and any party to the termination proceedings is free to offer proof of any other factor relevant to the best interest analysis. *See In re Gabriella D.*, 531 S.W.3d at 681–82.

In her brief Mother correctly notes that the petition to terminate parental rights was filed on June 15, 2022. She also correctly notes that at the time the petition was filed, the new twenty best interest factors in termination of parental rights cases should apply instead of previous factors codified in Tennessee Code Annotated § 36-1-113(i) (2021). Tenn. Code Ann. § 36-1-113(i) (2022); *In re A.W.*, No. E2022-01088-COA-R3-PT 2023 WL 3301248 (Tenn. Ct. App. May 8, 2023). However, both the final order as well as the oral ruling from the bench suggest that the previous factors under Tennessee Code Annotated § 36-1-113(i) (2021), or other factors, were applied instead.

It appears, as Mother indicates, that the juvenile court considered the factors set forth in the former version of Tennessee Code Annotated § 36-1-113(i) (2021). Nevertheless, we find no reversible error arising from this circumstance because the former best interest factors are contained within the new factors and because the final order reveals that the juvenile court considered the most relevant factors. *See In re Bralynn A.*, M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022), perm. app. denied (Aug. 12, 2022) (noting that there was "no reversible error when the trial court relies on the wrong factors because the old factors are essentially contained within the new factors"). Moreover, it appears that the juvenile court considered the most relevant factors. Thus, we shall proceed with our assessment of the best interest factors discussed by the juvenile court.

Here, after commenting that the list of best interest factors to consider is not exhaustive, the juvenile court first noted that the stability for the Children was its primary concern. Then the court went on to find that:

> [Mother] has exhibited no desire to meet the basic needs of Jaxson and Emma to include their material needs, educational needs, housing needs, and safety needs. [Mother] likely has some type of relationship with her children, however, the proof presented, and the testimony presented does not show that there is a healthy parent/child relationship. It is not possible to have a healthy parent/child relationship over Facetime and Zoom. [Mother] has not maintained regular visitation, even before her current incarceration.

Jaxson and Emma are still young and have the opportunity to flourish going forward. [Mother] has failed to demonstrate that she is able to provide stable and safe care for the children. [Mother] has failed to demonstrate that she would be able to provide stable and safe care for Jaxson and Emma. [Mother] has continued to have interactions with the legal system and has continued by her own admission to use illegal narcotics. It is in the best interest of both Jaxson and Emma that [Mother]'s parental rights be terminated.

The court then stated that it found the following factors enumerated in Tennessee Code Annotated § 36-1-113(i) to have been proven by a preponderance of the evidence:

(1) [Mother] has not made a lasting adjustment or changed her circumstances, conduct, and condition that would make it safe, and in the best interest of Jaxson and Emma to return to her. [Mother] has continued to have interactions with the legal system, as evidenced by her current incarceration. [Mother] has continued, by her own admission throughout the pendency of this case to continue using illegal narcotics. Lastly, [Mother] has refused to take advantage of the plethora of opportunities provided to her that would have made it appropriate for Jaxson and Emma to return home.

(2) [Mother] was given more than ample opportunities to visit with Jaxson and Emma. Although she did take advantage of some of the visits that were offered, she failed to take advantage of the majority of the opportunities that were provided. As this Court has previously noted, it is Mother's responsibility to take advantage of these opportunities, and not that of the Department to force the opportunities.

(3) Even before Jaxson and Emma came into the custody of the Department, [Mother] has not provided an appropriate home that is both healthy and safe. By her own testimony the chose poorly in the nature of her home and the environment in her home that allowed criminal activity, use of illicit substances, and through her own actions has shown that she was not capable then, and likely not in the future, to provide a safe and stable home environment for Jaxson and Emma.

(4) [Mother] has known that Jaxson and Emma were in the custody of the Department of Children's Services for almost two years. During that period, she has continued to use illicit substances and continued to have negative interactions with the legal system. [Mother] testified that it was this hearing that caused her to believe she should or could get her act together, she has done nothing to prove to this Court that she would be capable now or in the future of effectively providing safe and stable care for Jaxson and Emma.

(5) [Mother] has made no effort or attempt to support Jaxson or Emma. Despite knowing that she has an obligation to support the children, [Mother] has remained unemployed by her own choices and actions.

Based on the combined effect of these and other findings of fact, the juvenile court concluded that DCS had proven by clear and convincing evidence that it was in the best interests of the Children to terminate Mother's parental rights.

"Facts considered in the best interests analysis must be proven by 'a preponderance of the evidence, not by clear and convincing evidence.'" *In re Gabriella D.*, 531 S.W.3d at 681. Having reviewed the record and the trial court's findings, we have determined that the evidence preponderates in favor of the trial court's best interest findings. Having made this determination, we must now consider the combined weight of these facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. *Id.*; *see also In re Kaliyah S.*, 455 S.W.3d 533, 555–56 (Tenn. 2015). Having done so, we find the combined weight of these facts proved by clear and convincing evidence that termination of Mother's parental rights is in the best interests of the Children.

Accordingly, we affirm the juvenile court's determination that termination of Mother's parental rights is in the Children's best interests.

Having affirmed the juvenile court's determination that grounds have been proven and that termination of Mother's parental rights is in the best interests of the Children, we affirm the termination of her parental rights.

## IN CONCLUSION

Accordingly, we reverse the juvenile court's ruling that the grounds of abandonment by failure to visit and abandonment by failure to support had been proven but affirm the juvenile court's determination that the other four grounds were proved. We also affirm the determination that termination of Mother's parental rights is in the best interests of the Children. Accordingly, we also affirm the termination of Mother's parental rights.

Costs of appeal are assessed against the appellant, Chelcee S.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 15 -